Mr. Talent, when you are prepared, please proceed. Good morning, Your Honors. May it please the Court, Michael Talent, I represent Judge Eighmy in this Judicial Immunity Appeal. This case stems from an underlying custody dispute in Taney County Circuit Court in Missouri, and involves two acts by Judge Eighmy. Each act implicates a different part of the judicial immunity analysis. The first act, and therefore the first part of the analysis, is whether Judge Eighmy engaged in a judicial act when, in October 2019, he escorted the children, who are the plaintiffs here represented by their father, down to the detention holding area or detention area of the courthouse, and ordered officers to detain them for an hour, because the children had refused to comply with the custody agreement that the parents had reached that day and that Judge Eighmy had approved, and that all agreed on the record was in the children's best interest. The second question in a subsequent proceeding in the same custody dispute is whether Judge Eighmy acted in the clear absence of jurisdiction, when after the children and the father had not been complying with the terms of the settlement agreement, the mother filed a content motion in Taney County Circuit Court, and after the father and the children had didn't show up, Judge Eighmy issued a pickup order. That resulted in the children being detained in Louisiana by Louisiana deputies. The first is a judicial act under square precedent from the Supreme Court and this Court, and the second was an act done under the subject matter jurisdiction of Judge Eighmy, and so therefore was not done in the clear absence of jurisdiction, and he is entitled to judicial immunity for both acts. Turning first to the October 2019 detention, the question there is whether what Judge Eighmy did was a judicial act. This is a functional analysis. It looks first to whether the act relates to something, relates to an action or a function normally performed by a judge. This is the language used in, for example, Stump v. Sparkman and Justice Network. Judge Eighmy and his briefs provide three examples of normal judicial functions that relate to the act he did here. The kind of high-level question, the high-level act we're looking at here is whether it's a normal judicial function for a judge to order individuals who are defying or thwarting the efficacy of a judicial order, whether to . . . Was there an order in place? As I understood, this was a consensual agreement between the parents and there really was no order in place. The judge had approved the order that day, and that's in the record. Now, it wasn't — I think the — Mr. Rockett quibbles about whether it was denominated a final judgment under Missouri law, but everyone, I think, agrees that was the operative complaint and the operative kind of custody arrangement entered in court at that time, and everyone had agreed on the record. Were the children parties to this agreement? The children were — the parents are parties to a custody agreement. The children are kind of the — in Missouri, they're subject to the in-rem jurisdiction of the children were there, and as part of the proceeding, they weren't parties to the proceeding, as it were. But is it ordinary for judges to issue a — I assume the judge considered this contempt? What is the judge's authority and basis for seizing the children? We point to — so Judge Amin does point to the contempt procedure. It's a normal function, a normal authority of Missouri judges to be able to hold individuals. So is that — your position is that this was a contempt action? Judge Amin didn't denominate what authority he was operating under. It could be — it is — the question for immunity purposes is less about whether he exercised an authority lawfully given and more about whether what he did is something judges do. Well, how frequently in Missouri or any other state that you're familiar with do judges take people to holding cells? Well, in this case, what — so this is what relates to the seizure issue. The question for immunity purposes, Judge Smith, isn't really an empirical question in the sense that — in the sense as they're looking at Stumpy Sparkman, that was a petition for sterilization, and I think the dissent there argued this has never been done before. What the Supreme Court said is, even if a petition is passed on only once, that doesn't vitiate immunity. What matters is whether it's a function normally performed by a judge. And judges do normally engage in what may be termed a seizure under the Fourth Amendment by a show of authority. They do it, but not this way. I think this judge had a little bit of black robe disease and thought his power was maybe a little bit more than it actually was. And usually when you do something like this in state court — I used to be a state court judge — you actually go through some procedures. You don't walk into a conference room, you don't throw two kids into jail, make them take off all their shoes, put them in a holding pen, and then when they come out, tell them they're going to go to foster care if they don't listen. So two answers to that, Judge Strauss. The first is judicial. This — the context — this is where the context matters. So the court was over. The father was out of the courthouse that day. He had already gone, and he — the complaint says he couldn't get back in. So they're there in the courthouse with the mother, and they're not complying with the that Judge Amy had approved that day that everyone was agreed for the — agreed was their welfare. So I think the analogy here, if we want to draw, like, a process analogy, it's almost like a motion for reconsideration. The children approached Judge Amy and said, we don't like — we don't like this custody agreement. They knew he was a judge. We don't like this custody agreement, and we don't want to go home with our mother today. And so Judge Amy was presented with a situation where the children were not complying with an order that was entered for their welfare. And he — and — It's not a motion for reconsideration. I mean, there was no hearing. There was a — it was the non-parties that were — that were objecting to this. I mean, it doesn't look anything like a motion for reconsideration. I mean, that would be a judicial activity, a judicial function. And there are, as Judge Strass indicated, procedures that go with that. An order would issue, right? An order would issue following that motion for reconsideration, and then it would be enforced, presumably by an executive official, police officer, deputy, something along those lines. And the point for judicial immunity in this case is that immunity turned — procedural problems, grave procedural errors don't vitiate an act — an act's judicial nature. That's city of Haiti. I'm analogizing this to a motion for reconsideration to suggest that it was a judicial sort of function, because it — on its surface, it just doesn't look like it. Well, the children approached Judge Amy as a judge. They knew he approved the custody agreement. They knew he could release him. The authority — and this is — the authority he used to seize him, to quote-unquote seize him, was his judicial authority. They — and that the — Mr. Rockett agrees to that in his brief. So they approach him as a judge. They ask him, essentially — they debate about the validity of an order. They don't want to comply with it. And when they continue to refuse to comply with it, Judge Amy sends a — walks them down to the detention center and orders uniformed officers to take them into custody. That is a very — that's very similar, actually, to Newman v. Indiana. The judge there, that was a seizure. They sued for temporary deprivation of liberty. The Seventh Circuit noted that — and it was a midnight hearing in the judge's chambers. And the judge, after the hearing passed, said, I'm not going to grant your motion, your extra hearing, and you need to stay in my chambers until the sheriffs are done picking up the child at your — at your house. Now, my understanding, though — and correct me if I'm wrong — is the judge walked out from chambers. He didn't have his robe on. And you're saying that the children actually approached him. I thought he approached the ensuing discussion that was happening in the courthouse lobby. Am I wrong about that? I think that that is correct. But the engagement with the children and the reason they followed him was because he was a judge. And so the authority he exerts, even under Mr. Rockett's reading of this case, is his judicial authority. And when they don't comply with an order entered in for their welfare and tell him multiple times that they are not, the detention itself is — is functionally akin to a contempt hearing, the individuals refusing to comply with a court order or otherwise thwarting judicial process. And — or it's — it's related — you brought up foster care, Judge Strauss. It's related to the authority of the Missouri Circuit judges to take children into custody when it would be in their welfare. You know, I'm — I'm thinking that, actually, this doesn't fall under any government authority at all, which is an executive officer has to — you know, an executive official, a police officer, has to have at least probable cause or reasonable suspicion to stop and seize someone. He clearly didn't have arguable — or even arguable probable cause or arguable — arguable reasonable suspicion. So he wasn't using executive authority. And judicial authority ordinarily happens in a courtroom with, as Judge Kobus says, with some sort of process. So it doesn't appear that he's actually exercising judicial authority. And I don't think there's any legislative authority going on. So it seems to me like there was just no authority for what Judge Amy did. Well, we point out in Missouri law that he is allowed sua sponte to do contempt. He is allowed to order ex parte. The — this gets to the Forrester v. White, I think, at the end of the day. The informal and ex parte nature of a decision, of a court — of a court decision doesn't render it without immunity. Courts routinely issue ex parte orders. The — the — Mr. Rockett cites Lopez v. Vandervater out of the Seventh Circuit. That — the court there noted a plethora of orders that are issued by judges, not within the courthouse, not in the context of formal procedures. There could be ex parte motions, emergency motions judges have to rule on at their house. There are orders issued. Well, there was a custody agreement on the record that everyone agreed was in the best — As far as for the detention of the children, there was no formal order. Well, he ordered the uniformed officers to take them into jail. Well, after he had taken them down, he directed them to take certain other shoes off and the bracelet off. Is that correct? I mean — Well, yes. He — he escorted them, but then I would go to — He escorted them. He — they were in custody, don't you agree? They were in the same way the plaintiffs were in custody in Newman. The judge used his judicial authority to make — to deprive them of their liberty. That's kind of the Fourth Amendment test. The point is, the seizure, I think, analysis here, Mr. Rockett is — is trying to into a — a categorical analysis. Can I add one more thing? You're into your rebuttal time. I don't know if you want to address the second issue or — I'll address it real quickly, Judge Smith. And I think this one is actually very simple. Judge Amy has subject matter jurisdiction every — under Missouri law. Subject matter jurisdiction is a matter of constitutional law. Child custody disputes are civil matters within the subject matter jurisdiction of those courts, within the circuit courts of Missouri. Furthermore, the — so he has subject matter jurisdiction. And under Supreme Court precedent, under this Court's precedent, that's sufficient. Furthermore, the order he issued was to bring the children into his court for proceeding before him. So it was — this is really on all fours with Morales v. Waco. This was an order issued in aid of his jurisdiction in a case before him. And in that case, it is clearly an order issued with — with necessary jurisdiction that is without the clear absence of jurisdiction. One last question. My understanding is the Missouri Supreme Court mandamused most of what Judge Amy did. Was it only the second order, the first order, or both orders? Only the second order, Judge Strass. And only because of the recusal issue. If you read the — the order issue of the exhibit to the complaint, it wasn't for any jurisdictional — he lacked — it wasn't because he lacked subject matter jurisdiction. It was because of the recusal issue. Okay. And I'll reserve the rest of my time for rebuttal. Thank you. Thank you, Mr. Teller. Mr. Eastwood. Chief Judge Smith, may it please the Court, Hugh Eastwood for Bart Rockett, his next friend of his minor children. The complaint here plausibly alleges two incidents in which judicial immunity does not apply. This Court should affirm the district court. The facts here are admittedly egregious, extreme, and very unusual, as they are in most of the judicial immunity precedents, which are, thankfully, rare. Before I turn to my argument, I want to respond to a couple of things that occurred during my friend, Mr. Talent's, colloquy with you, Judge Strass. The pleading alleges that the judge approached the kids, not vice versa, and this was after any hearing or proceeding was completed. In other words, the children were not having a visit to the judge with an expectation that the judge was going to be performing some sort of judicial hearing or function. Second, there was no foster care petition or hearing before the Court. That makes this very distinguishable from those other line of cases. Even in Stump, there was a petition for sterilization, after all, before the Court. And finally, on the Newman v. Indiana case that we had some discussion of with you, Judge Kobus, there, of course, it was adults who were parties to the Court's orders who were presumably because of some concern about interference by adult parties to the case. Let me turn to the first incident. Seizing a person is an executive function. It is normally performed by law enforcement officers, jailers, or, in the case of children, doctors in Missouri. It is not a judicial function. And the fact that the judge said he was going to teach them a lesson or threaten to put them into foster care did not make it any more judicial function. Therefore, Judge Imey's acts in the first incident here fall into those line of cases where judges were denied immunities for stops, for seizures, for prosecution. It's similar to Molina. This is where the judge stopped the motorist on his commute home. To Gregory, where a judge assaulted a litigant in his courtroom. To Lopez, the judge was denied immunity for holding a man at gunpoint, arresting him, and prosecuting him. But he did have immunity for issuing orders and sentences in his courtroom. You know, one thing that I'm a little concerned about is state court dockets are just, I mean, they're immense. And if you've ever sat through one where there's 30 or 40 things going on in a morning, sometimes you see a little bit of street justice, where the judge does some stuff that may come close to the line or maybe even sometimes even cross it in their judicial function. And I'm a little concerned that this is a strange case, but that we're not venturing into some of those street justice areas. We should steer clear of them, particularly since you'd like for judges to have immunity when they're doing their very best to mete out justice and to deal with very difficult situations. Judge Charles, if you're getting to the second incident, where it's much more thick. Mostly the first. Mostly the first. Okay. We'll stick with the first. Fair enough. Stumpf speaks not just to, of course, the function or act of the judge engaged in, and it is a functional analysis. Judges do not normally seize children and throw them in jail cells after hearing — after completing a hearing over their parent's custody dispute. But Stumpf also talks about the expectation of the parties. And that is important here. First of all, the expectation of the parties would be the parent's expectation. And there's no allegation that either mom or dad here expected the judge to throw the kids into jail. The kids at the time here were 12 and 14 years old. Their youth, their vulnerability meant that they were not even inside the courtroom. Had it been suggested to the judge to leave the courtroom and visit with the children, talk to them? How did the conversation with the children arise after the completion of the in-courtroom proceeding? The complaint alleges, plausibly, that the judge, after court was done for the day when he was no longer acting in any sort of judicial function or capacity, took it upon himself to approach the kids in the courtroom lobby. And we know that under the precedence that location is certainly not a dispositive factor. Judges can functionally commit acts of judging from their house in the middle of the night in their pajamas, signing a warrant, for example. But here, the judge, to your point, Chief Judge Smith, the judge approached the children and sua sponte decided to get into a discussion with them about the custody order. This was not done inside his courtroom during any sort of proceeding. And it was also not done with the children's representative, the GAL, or with some sort of process of a hearing before the court with the parents and their counsel present. What I hear underlying your question, perhaps, Chief Judge Smith, is this question of alternatives. That's a really important point. The judge could have done all sorts of judgy things here. Was the guardian ad litem still present? No. No. The guardian ad litem was present during the courtroom proceeding that day when the parents entered into this sort of consent order, but no. I just wonder whether, and this gets back to my question, whether the judge was doing judgy things when the judge came out, pulled the kids into the conference room. So far, so good. I've seen judges do things like that, and that seems judicial. We just, I just got to be clear from you where he crossed the line. Did he cross the line later when he put them in jail? Where was the line crossed in your view? The line was crossed when he took them into the conference room without the GAL and without the parents, I believe. But certainly the gravamen of our allegation is that it's the seizure itself, and I don't think the seizure started until he sort of dragooned, to use the word from Zarcon, the coffee case, dragooned the kids down to the jail cell, had them take off their shoes, had the boy take off his religious bracelet, which he had made a promise not to give up, and put them in these adult cells where they were sort of terrified. So of course there was no boundaries to what would normally be considered an order. So I hold you in contempt. I'm incarcerating you for an hour, something of that nature. And there was no criminal contempt because there was no disruption of any judicial proceeding. That might be a different case for a different day, but here court was order over for the day. Well, and you see what I'm saying? Family law is just a different thing. I mean, for those who have never done family law, there's so much informality, so much, many parties get together, they try to figure it out. And so it runs a little differently than other types of judicial proceedings. Well, that brings me to the second incident in my remaining time before my friend Ms. Clark speaks for one of the amicus, which is that when he issued the pickup order, the judge had already made a determination that no party lived in Missouri and he encouraged the mother to go to court in Utah. So this is a judge acknowledging with predicate factual findings that he lacked jurisdiction under the UCCJEA. And that statute is a jurisdictional statute. The whole point of it is to stop these sort of interstate squabbles over which court is proper. Do Missouri courts agree with you that that's a jurisdictional statute? Missouri is in the minority of states that holds that the UCCJEA is not a subject matter jurisdictional statute. But that gets to the second point, which is judge's determination of subject matter jurisdiction is for actual cases and controversies before them. In Stump, there's a petition for sterilization before him. Here, there was no petition that would warrant a capious order, which is what this pickup order is. Those are normally issued in delinquency cases. There was no petition or motion for delinquency. In fact, the only thing before the court, which had already acknowledged it did not  It does not follow from that, that a capious order to pick up the children and take them into custody would issue. I mean, and this Court's own precedents in Birch and Schottle analyze the subject matter jurisdiction in terms of the matter before the court, the case or controversy, the petition before the court. In other words, subject matter jurisdiction is not sort of presupposed. It has to be conferred by the actual matter petting before the court. And that makes sense. We — there are precedents in the Missouri Supreme Court looking to a line of cases where courts of subject matter, even general jurisdiction, cannot sort of turn themselves into courts of inquiry and start adjudicating matters that are not actually before the court on proper petition or motion. But sometimes courts get it wrong. I mean, I'm sure this Court has been reversed by the Supreme Court because we've exceeded our jurisdiction in some case over the last 120 years. But that's still a judicial function that we've exercised. Correct. But I think the distinction is errors or maybe even excessive jurisdiction versus clear absence. I'm going to go back to Bradley, Your Honor, Judge Strauss, which is this is more like the probate judge hearing the criminal case. The probate matter here was the custody dispute. Issuing capious orders to seize children simply was not before him. And that's where that hypothetical is so important. Subject matter jurisdiction is analyzed within the context of the actual case or controversy pending before him. Finally, the judge does state this was a very unique situation. I have to differ. Custody disputes are routine throughout Missouri, the Eighth Circuit, the Nation, and we do not see horrific fact patterns like here. Thank you. Thank you, Mr. Eastwood. Ms. Clark. May it please the Court, my name is Victoria Clark and I represent Amicus, the Institute Ms. Clark, would you bend that mic down just a little bit and we can hear you a little better? Certainly. As I said, my name is Victoria Clark and I represent Amicus, the Institute for Justice, arguing in support of Mr. Rocket.  on this unique set of facts would be a historically anomalous outcome. In my brief time, I'd like to first address your Honor's questions about the line between judicial acts and non-judicial acts and specifically street justice, as your Honor called it. Because there is some daylight between the English common law doctrine and the modern American doctrine, but both doctrines are in agreement that on this unique set of facts here, Judge Imey was not engaged in a judicial act, specifically when he jailed the children. I'd like to work backwards and start with Logee Sales v. New York. We don't cite this in our brief, but it's 442 U.S. 319. And there, the Supreme Court clearly held that a judge acting like a law enforcement officer is not behaving in a judicial capacity. In that case, the judge had signed warrants for a search of a business, but then the judge personally went and began to enforce those search warrants and then continue to search that business. In that context, the Court said that the judge was not acting in a judicial capacity. And that is completely consistent with at least 400 years of English common law. In 1607, Floyd v. Barker, decided by Lord Cook, it's perhaps the most well-known judicial immunity decision in the history of common law. And again, it expressly limits immunity to judicial acts. Specifically, Floyd makes it clear that subjecting individuals to out-of-court enforcement actions without any legal process is not a judicial act to which immunity attaches. Lord Cook wrote that a judge, quote, cannot be charged for conspiracy for that which he did openly in court as judge or justice of peace. But Lord Cook contrasted that with false and malicious prosecutions out of court which find someone guilty. And Lord Cook wrote that those could be amounting to an unlawful conspiracy. In short, even Lord Cook agreed that engaging in extrajudicial out-of-court enforcement actions was not protected by judicial immunity. So while the modern judicial immunity doctrine gets a lot of things wrong about the English common law, it is an agreement on this one. Specifically, Judge Amy's acting like a law enforcement officer and deciding to personally jail the children after the custody agreement. I was just going to ask, do you agree with where the line is, though? I mean, at least in terms of pulling him into the conference room, talking to them, trying to convince them that the order is in their best interest. Do you think that was a judicial function? Your Honor, we would defer to Mr. Rockett's counsel on that. However, what is really clear, the Supreme Court enforcer has said that the line between judicial and nonjudicial acts is fuzzy. So perhaps that's, you know, a fuzzy area. What's not fuzzy was the actions that came after it, where the judge personally sees the children, march them down to jail. And at that point, he was not behaving like a judge. He was behaving like a police officer. And so he's not entitled to any special protections for behaving as a judge. Additionally, I would like to talk very briefly about the jurisdictional piece of this argument. Again, I defer to Mr. Rockett's counsel on the specifics of the modern doctrine of jurisdiction here. But what I will say is that historically, English common law courts looked at both subject matter jurisdiction and personal jurisdiction in making the determination of whether immunity applies. And there's a case, Holden v. Smith. Again, we didn't really cite it in our brief. But it's 117 English Reports 323 in 1850. And there, the court held in a case that is very similar facts to here, that a judge didn't receive judicial immunity for exercising jurisdiction that the judge knew was outside of his personal jurisdiction. The judge in Holden had a case that was initially properly before him. But then he found out that one of the litigants in the case had moved into a different county. And the court attempted to enforce a contempt order out of the county, even though the judge knew for a fact he did not have personal jurisdiction to do so. On the first issue, you indicated that English common law and American judicial immunity agreed. On the second issue, is there agreement or not? Yes. Related to personal jurisdiction. Yes, Your Honor, there is, specifically related to personal jurisdiction. And so, again, the historical grounding of this argument, you know, the Supreme Court has grounded judicial immunity in the English common law. And so, you know, this court certainly could and should decide that personal jurisdiction as well as subject matter jurisdiction. What's the difference, though, or what's the dividing line between making a mistake or making an error of jurisdiction and clearly exceeding your jurisdiction? Because I think that's the comparison that you're trying to draw. And that seems to me to be even a fuzzier line than some of the other ones we've talked about. Yes, Your Honor, I see a matter of time. May I briefly respond? You can answer the question. Thank you. Yes, Your Honor. So the line is fuzzy in some cases again. But here it's not. Judge Imey knew that he did not have jurisdiction. He even, at one point, ordered the children's mother to consider refiling in another state because he understood that personal jurisdiction was fuzzy there. And then he continued to issue orders in the case and even the pickup order for the children in a different state, knowing it is in a different state, and then ultimately causing a Louisiana court, you know, to sign a warrant to seize the children. So Judge Imey knew that he was acting outside of his jurisdiction and continued to act anyway, which is on all fours with Holden v. Smith. And for these reasons, we respectfully ask the Court to affirm the judgment of the District Court. Thank you. Thank you, Ms. Clark. Thank you, Your Honors. Two quick points on the pickup order and jurisdiction writ large and then a couple quick points on the detention. There's one overarching point, though. Mr. Eastwood came up here and said there was no case for custody before Judge Imey. There was no case before Judge Imey. There was a case. There was a custody case before him. There's been a custody case before him this entire time, which leads into my second point relating to the fact that relating to the pickup order and personal jurisdiction writ large, there's been Mr. Eastwood, Mr. Rockett has not refuted the point that Judge Imey had UCCJEA jurisdiction. The 2009 custody arrangement was issued out of Taney County Circuit Court. So under Missouri law, Taney County Circuit Court had exclusive jurisdiction to modify that order. Secondly, even viewed under kind of an original custody order or custody proceeding, Judge Imey had jurisdiction because the California court had declined jurisdiction in the 2013 modification case in the call with the judge earlier that day. How does that extend to the obtaining of a habeas pickup order for the children themselves? Well, so firstly, that establishes jurisdiction over the custody dispute, which is what Mr. Rockett argues. And secondly, establishes that the pickup order was indeed an order issued in aid of the proceeding before him. That is a custody dispute that was correctly before Judge Imey. More broadly, Mr. Rockett and the amicus is wrong that personal jurisdiction is necessary. Stump v. Sparkman and Bradley v. Fisher focused on subject matter jurisdiction. This Court's precedents all focus on subject matter jurisdiction. Indeed, the case that Mr. Rockett cites, Duba v. McIntyre, when it discussed personal jurisdiction, did so in a litany of jurisdictional concerns, kind of in a vein of the jurisdiction is a word of many, too many meanings idea that we see a lot of out of the Supreme Court, and ultimately held that for purposes of immunity, the question is whether defendant's action is authorized by any set of conditions or circumstances. That's on page 592 of that case. That leads, I think also, that segues very nicely into the detention of the children. There was a question here. Mr. Eastwood was drawing lines between executive and judicial functions. Judge Strass, I believe you mentioned that. Out of the Eleventh Circuit, the Harris case, cited by this Court favorably in Woodward v. Holsoft, a judge there ordered a prosecutor to initiate charges. Initiating charges is prototypically or regularly considered to be an executive function. But the Eleventh Circuit held that the judge could do that under State authority. He could bind people over. And as a result, even though that was categorically maybe an executive function, it was also a judicial function in the context of that case. So kind of pairing that with the language from Duba about any set of conditions or circumstances, what we have here is a judge who is faced with children who do not want to comply with a custody agreement that was entered into for their welfare. He talks with them. They tell him they don't want to comply. And he eventually orders them detained, both as a type of contempt proceeding or analogous to contempt and analogous to his authority to hold them in custody for their welfare. Last point on this record dispute, Judge Mr. Rockett in his brief argues or cites Joint Appendix page 18 for the proposition that Judge Amy approached the children. I just reviewed that. It's ambiguous as to who approached who. Maybe Judge Amy was walking out and saw what was going on in the courthouse lobby. But I will point out that that claim is not, in my reading of the record, supported by the record. And for those reasons, we would ask the court to reverse the district court. Thank you. Thank you, Mr. Tallow. The court thanks all counsel for your participation and argument before the court this morning. I will continue to study the briefing materials and render a decision in due course. Thank you.